IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:18-CR-318-FL-1

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | |
| | ) | ORDER |
| BRANDON MARQUIS JENNINGS, | ) | ~~XXXXXXXXXXXX~~ |
| | ) | ~~(UNDER SEAL)~~ |
| Defendant. | ) | |

This matter is before the court on the government's motion for protective order (DE 326) pursuant to 18 U.S.C. § 1514(b)(1).   The court held evidentiary hearing on the government's motion May 29, 2023, and in this posture the issues raised are ripe for ruling.

## STATEMENT OF THE CASE

In June 2019, following four-day trial, a jury convicted defendant of the following offenses: sex trafficking by force, fraud, or coercion, in violation of 18 U.S.C. § 1591(a), (b)(1) (counts 1 and 2); sex trafficking of a minor, in violation of 18 U.S.C. § 1591(a)(1), (b)(2) (counts 3 and 4); production of child pornography, in violation of 18 U.S.C. § 2251(a), (e) (count 5); interstate transportation of a minor for illegal sexual activity, in violation of 18 U.S.C. § 2423(a) (count 6); interstate transportation for prostitution by coercion and enticement, in violation of 18 U.S.C. § 2422(a) (counts 7 through 9); interstate transportation for prostitution, in violation of 18 U.S.C.

---

[1]     Where this order references certain sealed filings, the parties are DIRECTED to file jointly under seal, within 14 days, a copy of this order marked to reflect any perceived necessary redactions with the words "Proposed Redacted" affixed to the captioned title.   Upon the court's inspection and presuming its approval, a redacted copy of this order, as proposed by the parties in accordance with controlling authority, will be made a part of the public record.   If upon its review the court determines a different approach other than what is proposed may be necessary, notice will be given.   If the parties jointly determine no redaction is warranted, they are DIRECTED to file jointly, within that same 14-day period, a notice to that effect.   In that event, the clerk will solicit the court's approval to unseal this order before taking additional action.

§ 2421(a) (counts 10 through 12); and use of the internet to promote prostitution and aiding and abetting, in violation of 18 U.S.C. §§ 1952(a)(3) and 2 (count 13). The court sentenced defendant to concurrent terms of life imprisonment on counts 1 through 4 and 6; 360 months' imprisonment on count 5; 240 months' imprisonment on counts 7 through 9; 120 months' imprisonment on counts 10 through 12; and 60 months' imprisonment on count 13.

The court also imposed aggregate term of 15 years' supervised release in the event defendant is released from imprisonment. The conditions of supervised release include directive that defendant shall "have no direct or indirect contact, at any time and for any reason, with the victim(s), the victim[s'] famil[ies], or affected parties in this matter" absent authorization from United States Probation. (DE 194 at 7). Finally, the court ordered defendant to pay $1,880,648.25 in restitution to the victims.

By the instant motion for protective order, filed November 30, 2023, the government seeks an order prohibiting defendant from harassing two of the victims in this case, referred to as T.H. and T.C., for a period of three years. In support, the government relies on affidavit of special agent M.C. Glenn Covington with the Department of Homeland Security and exhibits thereto including 1) excerpts of transcripts of T.H. and T.C.'s trial testimony; 2) copies of text messages between defendant and T.H. and T.C.; 3) defendant's December 2022 correspondence to T.H.; and 4) defendant's December 8, 2021, correspondence to government counsel Erin Blondel.

In response to this motion, the court requested the government's position on whether the Federal Bureau of Prisons ("FBOP") could restrict defendant's communications with the victims without the need for formal procedures under 18 U.S.C. § 1514(b)(1). The government responded that the FBOP's internal policies are an imperfect mechanism for restricting defendant's

2

communications, where they cannot prevent indirect communication through third parties, and the government therefore reiterated its request for protective order under § 1514(b).

In the interim, defendant moved for appointment of counsel in connection with the protective order proceedings. By order entered February 13, 2024, the court granted defendant's motion and thereby appointed counsel to provide representation during the protective order proceedings.[2] In that same order, the court granted the government's request for formal proceedings under § 1514(b).

Evidentiary hearing on the government's motion was held May 29. The court received testimony from Covington, Aaron McRee, a criminal analyst with the Department of Homeland Security, and defendant. The court also received into evidence Covington's affidavit and the exhibits thereto described above, and the following additional exhibits: 1) defendant's FBOP active "contacts list" listing individuals or entities he may contact from prison; 2) Analyst McRee's report analyzing defendant's contacts list; 3) defendant's FBOP telephone call records; and 4) defendant's FBOP inactive contacts list.

At the close of the hearing, and in light of testimony received, the court requested the parties' positions as to whether they could agree on the terms of a protective order. The parties responded that they would attempt settlement discussions, and the court directed them to file any stipulated agreement within two weeks. Ultimately, the parties were not able to reach resolution, thus returning the matter to the court for resolution.

As discussed further below, defendant's pending motions to vacate, set aside, or correct his sentence also are relevant to the issues raised in the government's motion for protective order.

---

[2] Counsel ably represented defendant for the protective order proceedings, and the court is grateful for counsel's service in this matter.

From January to August 2022, defendant filed multiple motions to vacate that were procedurally defective. On August 8, 2022, defendant filed his first procedurally correct motion to vacate. Over the next several months, defendant filed numerous motions to amend the first motion to vacate. On November 4, 2022, the court directed defendant to file one comprehensive motion to vacate asserting all claims he wishes to pursue under § 2255. Defendant filed two such comprehensive motions on December 5 and 12, 2022. These motions remain pending as of the date hereof. In addition, in late December 2022 defendant filed numerous requests for discovery from the victims related to their trial testimony and defendant's claims in the § 2255 motions.

Defendant also filed several motions to appoint counsel with respect to the § 2255 proceedings in 2022 and 2023. The court denied these motions to appoint counsel, finding defendant had not met the requisite legal standard. In January 2023, defendant reported that he was attempting to hire counsel for purposes of the § 2255 proceedings. The court granted his request for a stay of the § 2255 proceedings while he attempted to secure counsel. Ultimately, defendant was not able to secure counsel and he elected to proceed on a pro se basis for the pending motions to vacate described above.

## STATEMENT OF FACTS

Defendant's underlying offense conduct, as it relates to T.H. and T.C. in particular, provides context for the government's allegations of harassment in the instant motion. Defendant's convictions arise from his sex trafficking of numerous victims by coercing them to engage in prostitution and retaining most of their earnings. T.H., for example, testified that in 2015 defendant invited her to Colorado on the false pretense of starting a car detailing business

4

and continuing their romantic relationship. (DE 326-2 at 11–14).[3] She traveled with defendant from North Carolina to Colorado, where they soon ran out of money. (Id.). In order to raise money, defendant convinced T.H. to prostitute. (Id. at 15). After T.H. began prostituting, defendant exerted control over her and forced her to continue prostituting by instilling fear, intimidating her, and physically and emotionally abusing her. (See id. at 30–36, 52–53). For example, defendant struck T.H. in the face, threw an iron at her, and threatened to kidnap her children. (Id. at 30–36, 41–42, 52–53). He also retained T.H.'s prostitution earnings. (Id. at 49).

In April 2016, T.H. escaped from defendant's control and fled from Oregon to Colorado. (Id. at 55–62). But defendant followed T.H. to Colorado, found her at a friend's residence, and threatened to kill her and harm her friend. (Id. at 56–69). During the encounter, defendant ripped the windshield wiper off her vehicle and destroyed the driver-side mirror. (Id.). The following day, defendant sent a series of threatening messages to T.H., including: "Ima blow your [expletive] head off and leave it in your [expletive] lap[.] I'm not joking you gotta go[.] You better not go anywhere[.] Cause if I catch you it's a wrap[.]" (DE 326-3 at 5–6). At trial, T.H. testified she believed defendant was capable of carrying out these threats. (DE 326-2 at 68–70, 86).

T.C. met defendant through an online dating service in 2016, and she initially believed that they were in a legitimate romantic relationship. (DE 326-4 at 3–13). Defendant directed T.C. to engage in prostitution in order to raise money so he could purchase a plane ticket to T.C.'s location. (Id.). After defendant arrived, he convinced T.C. to continue prostituting while he retained her

---

[3]    Unless otherwise specified, page numbers specified in citations to the record in this order refer to the page number of the document designated in the court's electronic case filing (ECF) system, and not to page numbering, if any, specified on the face of the underlying document.

Case 5:18-cr-00318-FL   Document 375   Filed 08/14/24   Page 5 of 25

earnings, claiming that they would use the money to buy a house on an island. (Id. at 13–16, 25, 29–30). During this time, defendant physically abused T.C., exerted near total control over her, deprived her of food and sleep, and repeatedly threatened to kill her and hurt her children. (Id. at 34–39).

On December 9, 2016, while at defendant's family residence, T.C. told defendant that she wanted to leave him. (Id. at 71). Defendant demanded that T.C. give him all her possessions, including her phone, before he would allow her to leave. (Id. at 71). T.C. resisted because photographs of her children were on the phone. (Id. at 71). Defendant responded by violently assaulting her, including striking her in the head with such force that it caused a seizure. (Id. at 72–74). At the time of the assault, defendant knew that T.C. was pregnant with his child. (Id. at 77). Eventually, law enforcement arrived and arrested defendant on unrelated charges. (Id. at 76).

Defendant's sister, who was present at the residence but did not intervene during the assault, drove T.C. to the hospital. (Id. at 75–77). On the way to the hospital, she recommended that T.C. falsely report she was assaulted during an altercation with another female at a local grocery store, because telling the truth was "something [T.C.] really wouldn't want to do." (Id. at 77). At the hospital, T.C. learned that she had bleeding on her brain, broken ribs, and her eyes were swollen shut. (Id.). Following the assault, defendant sent threatening messages to T.C., stating "It's a wrap for you[.] Ima kill you[.]" (Id. at 87–88, DE 326-5).

Remarkably, and despite the order in the judgment of conviction providing defendant shall have no contact with the victims during supervised release, defendant made several attempts to contact T.H. and T.C. following sentencing. As discussed at hearing, the FBOP will not enforce the judgment's no-contact order while defendant is in custody because the provision applies to

6

defendant's supervised release. Moreover, although the FBOP has placed defendant on mail restrictions with respect to contacting the victims, that does not prevent him from circumventing the FBOP's processes by directing third parties to contact the victims on his behalf. (See DE 336). And despite the mail restrictions, defendant was allowed to add T.H. to his FBOP contacts list, and he communicated by telephone with victim R.W. on multiple occasions in 2023.[4] (See Hr'g Ex. L).

The relevant post-conviction contacts with T.H. and T.C. may be summarized as follows. In December 2022, defendant sent two letters to T.H. (DE 327-1). In those letters, defendant states, "I want you to know that I forgive you and ask that you forgive me too;" that his purported "friendship" with T.H. "mean[s] so much to me and I will always love and care for you;" and that his treatment of her amounted to "just how that lifestyle is." (Id.). He also requested pictures from her, and asked for her phone number. (Id.). Defendant concluded the letter by stating, "I will always love you, as does a mother loves it's child, Genuine! I don't lust you. I love you and that is forever." (Id.). In the second letter, defendant writes "I'm not upset as to how things went, I'm more so upset because you've not written me." (Id.).

Covington, the DHS investigator, together with government counsel and a victim specialist, contacted T.H. in November 2023 to discuss the letters. (Covington Aff. (DE 326-1) ¶ 4).[5] T.H. was audibly upset during the interview, and she reported that receiving the letters caused her to feel anxious and angry for days. (Id. ¶¶ 5–8). She was surprised that defendant remembered her address in North Carolina, and that he was able to send her letters while in

---

[4]  The contacts with R.W., discussed at hearing, were consensual.

[5]  At hearing, Covington testified consistently with the following information drawn from her affidavit.

custody.  (Id. ¶ 5).  At hearing, Covington noted that defendant had visited T.H. at that residence in the past, where he met her children and other family members, and that he threatened T.H.'s children during the offense conduct.  T.H. described receiving the letters as "jaw dropping" and that the letters were "mind rape and manipulative."  (Id. ¶¶ 6, 9).  She wondered if defendant would "continue" to "torment[] and harass[]" her for the foreseeable future, until she moved from the residence.  (Id. ¶¶ 8, 10).  Even though Covington interviewed her 11 months after the contacts, T.H. remained upset that defendant remembered her address and attempted to contact her.

Turning to T.C., Covington and government counsel also interviewed her in November 2023.  T.C. advised that in 2021 approximately six people contacted her through social media on behalf of defendant.  (Id. ¶ 13).  These individuals include defendant's sister, who failed to intervene during defendant violent assault on T.C. described above, and who encouraged her to lie about the assault at the hospital.  (See id. ¶ 14; DE 326-4 at 75–76).  These individuals told T.C. that defendant wanted to speak with her, and some of them referred to T.C. as defendant's child's father.  (Covington Aff. (DE 326-1) ¶ 13).  They requested T.C.'s mailing address, phone number, and pictures of her children to send to defendant.  (See id.).  Although T.C. threatened to call the police and attempted to block the individuals or change her social media accounts, they continued contacting her.  (Id. ¶¶ 13–14).  In addition, defendant wrote to government counsel in December 2021 requesting that she make arrangements with T.C. to allow defendant to see his child, and to send him pictures of either T.C. or the child.  (DE 327-2).

T.C. suffered significant fear and distress as a result of the foregoing contacts.  (Id. ¶¶ 15–17).  During the offense conduct, defendant "often bragged . . . that he had people everywhere, including in the [western United States, where T.C. currently lives], who were his partners in

8

illegal prostitution." (Id. ¶ 15). In addition, Covington testified at hearing that defendant is a validated member of a gang based in the western United States, and that during the offense conduct he told T.C. that he could direct gang members to harm T.C. or her family. In order to avoid further contacts, T.C. changed her social media presence, including by deleting accounts, stopping use of other platforms, and changing her settings on other accounts to prevent receiving notifications over email. (Id. ¶ 16). "She has changed her phone number numerous times because she is afraid that [defendant] or his 'people' would find her and her family." (Id.). The attempted contacts have "triggered" T.C.'s mental health symptoms, and she continues to fear defendant's ability to harm her or her children through third parties. (See id. ¶ 17; see also Sent'g Tr. (DE 210) at 37–38).[6]

At hearing, Covington confirmed that T.C. remains fearful for her own and her family's safety in light of defendant's offense conduct, threats, and his ability to find her and attempt to contact her through third parties. T.C. began crying when she discussed these issues with Covington, especially when expressing her belief that defendant remains capable of harming her through third parties.

Defendant also testified at hearing. He claimed that the attempts to contact T.H. and T.C. were based on his need to investigate the claims in his pending motion to vacate the convictions and sentence under 28 U.S.C. § 2255. In particular, another victim referred to at trial as R.W. allegedly told defendant that the victims who testified at trial discussed the case outside the courtroom and coordinated their testimony, in violation of the court's sequestration order. Defendant also purportedly discovered that government counsel "coached" the victims as to what

---

[6]     At hearing, Covington testified consistently with the foregoing information drawn from her affidavit.

Case 5:18-cr-00318-FL    Document 375    Filed 08/14/24    Page 9 of 25

they should testify to in court.

As discussed above, defendant filed motions to appoint counsel for purposes of the § 2255 proceedings, and he testified at hearing that he requested counsel in part so that appointed counsel could serve as an intermediary to contact the victims on his behalf. According to defendant, because these motions were denied, (see DE 253, 276), he attempted to contact both T.H. and T.C. on his own, in order to determine whether they would corroborate the information he learned from R.W. Furthermore, defendant claimed that he never directed his family or other third parties to contact T.C., and that his only attempt to contact her was the letter he wrote to government counsel in December 2021. (DE 327-2).

Defendant also asserted at hearing that he attempted to contact T.C. (through government counsel) in order to arrange for contact with his child. But defendant acknowledged that he has not established any legal rights to contact the child, and that he did not try to establish contact with the child for the two years between the birth and his arrest on the instant charges, even though he was not in custody during that period of time. Finally, defendant admitted at hearing that he wrote to government counsel and asked for pictures of her to be "funny" and to "get under her skin."

## COURT'S DISCUSSION

A.    Legal Framework

The government moves for protective order pursuant to 18 U.S.C. § 1514(b). The statute, enacted as part of the Witness Victim and Protection Act, provides in relevant part that:

> [the] district court, upon motion of the attorney for the Government, or its own motion, shall issue a protective order prohibiting harassment of a victim or witness in a Federal criminal case or investigation if the court, after a hearing, finds by a preponderance of the evidence that harassment of an identified victim or witness in a Federal criminal case or investigation exists . . . .

10

18 U.S.C. § 1514(b)(1).[7]

At the hearing, "any adverse party . . . shall have the right to present evidence and cross examine witnesses." Id. § 1514(b)(3). The maximum durational term for any protective order issued under the statute is three years, although the government can apply for new protective order 90 days before expiration of the order. Id. § 1514(b)(5). Finally, "whoever knowingly and intentionally violates or attempts to violate an order issued under this section shall be fined under this title, imprisoned not more than 5 years, or both." Id. § 1514(c).

The United States Court of Appeals for the Fourth Circuit has not addressed this statute in a published opinion. To the extent issues of statutory interpretation arise, the court's inquiry properly "begins with the statutory text." National Ass'n of Mfrs. v. Dep't of Def., 583 U.S. 109, 127 (2018); Jimenez v. Quarterman, 555 U.S. 113, 118 (2009) ("As with any question of statutory interpretation, our analysis begins with the plain language of the statute.").[8] Where there is ambiguity, the court "look[s] to legislative intent," CGM, LLC v. BellSouth Telecomms., Inc., 664 F.3d 46, 53 (4th Cir. 2011), as demonstrated through "[t]he purpose, the subject matter, the context, [and] the legislative history . . . of the statute." International Primate Prot. League v. Adm'rs of Tulane Educ. Fund, 500 U.S. 72, 83 (1991); see also Sierra Club v. U.S. Army Corps of Eng'rs, 909 F.3d 635, 645 (4th Cir. 2018) ("[W]e start with the plain language of Section 1341(d) of the Clean Water Act but also consider its structure, purpose, and legislative history as additional evidence of congressional intent.").

---

[7]     The statute continues "or that such an order is necessary to prevent or restrain an offense under [18 U.S.C. § 1512], other than an offense consisting of misleading conduct, or under [18 U.S.C. § 1513]." This final phrase is not applicable to the government's motion. The statutory definitions for harassment and related terms are discussed in the analysis below.

[8]     In this order, all internal citations and quotations are omitted from citations, unless otherwise specified.

B.    Analysis

Before turning to the merits, the court addresses two preliminary matters: 1) whether the statute permits entry of post-conviction protective orders; and 2) whether the Federal Rules of Evidence apply in these proceedings.

1.    Post-conviction orders

As discussed above, the statute provides for entry of protective orders to prohibit harassment of a victim or witness in a "federal criminal case or investigation." 18 U.S.C. § 1514(b)(1). Defendant's trial and sentencing in this case have concluded, which raises the issue of whether protective orders are permitted for a federal criminal case that is in the post-conviction stage.

The relevant provision states that the court "shall issue a protective order prohibiting harassment of a victim or witness in a Federal criminal case or investigation" if the court finds harassment of the victim or witness has occurred. See 18 U.S.C. § 1514(b). This language does not limit protective orders to pending or pre-conviction criminal cases. See United States v. Lewis, 411 F.3d 838, 844 (7th Cir. 2005) ("Nothing in § 1514 indicates that Congress meant to terminate protection as of the time the trial was over."). Accordingly, the court retains authority to issue post-judgment protective orders under § 1514(b). See Russello v. United States, 464 U.S. 16, 20 (1983) ("If the statutory language is unambiguous, in the absence of a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive."); see also Lewis, 411 F.3d at 844.[9]

---

[9]    Notably, defendant did not challenge the court's authority to issue post-judgment orders during the instant proceedings.

2.    Evidentiary Standards

At hearing, the court explained it would not require strict compliance with the Federal Rules of Evidence, and in particular the rules governing hearsay evidence. While the rules of evidence apply to most "criminal cases and proceedings," an exception exists for "miscellaneous proceedings such as: extradition or rendition; issuing an arrest warrant, criminal summons, or search warrant; a preliminary examination in a criminal case; sentencing; granting or revoking probation or supervised release; and considering whether to release on bail or otherwise." Fed. R. Evid. 1101(b), (d)(3). The phrase "such as" indicates the list of proceedings is non-exhaustive, and the court therefore has discretion to determine whether other miscellaneous proceedings are exempted. See United States v. Hawley, 919 F.3d 252, 257 (4th Cir. 2019); see also United States v. Walker, No. 2:18-CR-37-FL-1, 2019 WL 4412909, at *4–5 (E.D.N.C. Sept. 13, 2019).

Here, the instant motion for protective order is analogous to miscellaneous criminal proceedings such as revocation of supervised release, sentencing, or proceedings to determine pretrial release on bail. See Fed. R. Evid. 1101(d)(3); Walker, 2019 WL 4412909, at *4–5. Section 1514 governs proceedings for issuing protective orders to prevent harassment in an underlying federal criminal case or investigation. See 18 U.S.C. § 1514(b). Similar to sentencings, or proceedings to determine release on bail or revocation of supervised release, the instant civil proceeding is collateral to an underlying criminal prosecution. And where § 1514 proceedings are analogous to the exempted proceedings listed in Rule 1101(d)(3), the court found the rules of evidence do not apply.

Notably, § 1514(b)(3) provides that "any adverse party named in the complaint shall have the right to present evidence and cross-examine witnesses." This provision, however, does not require application of strict evidentiary rules. Those same rights are available in sentencings and

13

revocation proceedings, even though hearsay generally is admissible in such proceedings.  See Fed. R. Crim. P. 32.1(b)(2); U.S.S.G. § 6A1.3 p.s. & cmt.; United States v. Wilkinson, 590 F.3d 259, 269 (4th Cir. 2010); United States v. Doswell, 670 F.3d 526, 530–31 (4th Cir. 1982).  Here, § 1514(b)(3) provides defendant with the right to cross examine witnesses offered at the hearing, or to call his own witnesses, but it does not prohibit the use of hearsay evidence in the proceeding.

In any event, defendant has not argued that the statute requires direct cross examination of the victims.  While he lodged several unspecified objections during Covington's testimony, defendant did not object when the court explained at the outset that the federal rules of evidence would not apply.  Nor did defendant assert that the court violated his rights under the statute by not requiring testimony from the victims.  Thus, this issue is waived or forfeited.  See Hamer v. Neighborhood Hous. Servs. of Chicago, 583 U.S. 17, 20 n.1 (2017); United States v. Shea, 989 F.3d 271, 282 (4th Cir. 2021).

3.    Merits

Turning to the merits, the government must establish defendant harassed T.H. and T.C. by a preponderance of the evidence.  See 18 U.S.C. § 1514(b)(1).  The statute defines harassment as "a serious act or course of conduct directed at a specific person that (i) causes substantial emotional distress in such person; and (ii) serves no legitimate purpose."  Id. ¶ 1514(d)(1)(B). The term serious act refers to "a single act of threatening, retaliatory, harassing, or violent conduct that is reasonably likely to influence the willingness of a victim or witness to testify or participate in a Federal Criminal case or investigation."  Id. § 1514(d)(1)(F).  The phrase "course of conduct" is defined as "a series of acts over a period of time, however short, indicating a continuity

14

of purpose."  Id. § 1514(d)(1)(A).

Although the statute does not further define the phrases "harassing conduct," "substantial emotional distress," or "no legitimate purpose" these terms and phrases have an ordinary, commonsense meaning.  See Perrin v. United States, 444 U.S. 37, 42 (1979) ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.").  Such meaning can be derived "by reference to judicial decisions, common law, dictionaries, and the words themselves because they possess a common and generally accepted meaning."  United States v. Shrader, 675 F.3d 300, 311 (4th Cir. 2012).

For example, courts have defined "substantial emotional distress" in the related context of the cyberstalking statute, 18 U.S.C. § 2261A(2), as: "mental distress, mental suffering or mental anguish, and includes depression, dejection, shame, humiliation, mortification, shock, indignity, embarrassment, grief, anxiety, worry, flight, disappointment, nausea, and nervousness, as well as physical pain."  United States v. Osinger, 753 F.3d 939, 945 (9th Cir. 2014) (quoting Veile v. Martinson, 258 F.3d 1180, 1189 (10th Cir. 2001)); see also United States v. Fleury, 20 F.4th 1353, 1370 (11th Cir. 2021) (noting district court employed similar definition). [10]  In addition, "substantial" requires a showing that the emotional distress is "of real significance" or weighty. Substantial (def. 4), Oxford English Dictionary (online ed.).

The term "harassing" typically refers to conduct designed to "disturb persistently; torment" or to "pester; persecute."  Shrader, 675 F.3d at 310.  The remaining phrase "no legitimate purpose" has a common meaning that does not require further definition.  See id. at 311.

---

[10]     The Fourth Circuit has not addressed the definition of substantial emotional distress in a published opinion.

Here, to the extent a threshold finding of harassing conduct is necessary under either the definition of "course of conduct" or "serious act," the government has established this requirement by a preponderance of the evidence. Compare 18 U.S.C. § 1514(d)(1)(A) (defining course of conduct to include "a series of acts") with id. § 1514(d)(1)(F) (defining "serious act" to include harassing conduct). As recounted herein, defendant sent two letters to T.H. stating that he "forgives" her for her testimony against him, that he will "always love and care for [her] . . . as a mother love's it's child" and requesting pictures and her phone number. (DE 327-1). As Covington testified at hearing, the request for pictures is particularly disturbing to victims of sex trafficking when during the offense conduct such pictures were posted online for purposes of prostitution. Defendant also attempted to excuse his egregious offense conduct by stating that "is just how that lifestyle is." (Id.). In the second letter, defendant stated that he was "upset" because T.H. did not respond to his first letter. (Id.).

As discussed further below, defendant's testimony that these letters were intended to re-establish a legitimate relationship with T.H. or discuss the claims in his motion to vacate was not credible. Instead, the court finds defendant well knew the letters would retraumatize and harass T.H. When considered in the context of the extensive pattern of abuse, control, and prostitution of T.H. during the offense conduct, these letters constitute harassing conduct under any standard definition of that term. See Shrader, 675 F.3d at 312 ("Whatever other definitions one might hypothesize for the meaning of 'harass or intimidate,' there can be little doubt that Shrader's stalking falls within the conduct the statute is intended to proscribe."). And such harassment is reasonably likely to influence the willingness of T.H. to testify or participate in this case or other federal criminal cases or investigations. See 18 U.S.C. § 1514(d)(1)(F).

The third-party contacts with T.C. also constitute harassing conduct. First, although defendant denied at hearing that he directed his family members or other third parties to contact T.C. through social media or other electronic means, that testimony was not credible. Instead, the court finds the opposite: defendant indeed directed these individuals to contact T.C. See Wright v. West, 505 U.S. 277, 296 (1992) (trier of fact may consider perjured testimony as affirmative evidence of the opposite fact). And as set forth above, approximately six different individuals attempted to contact T.C. through social media on behalf of defendant, including defendant's sister who was present during his violent assault on T.C. and failed to intervene. (Covington Aff. (DE 326-1) ¶¶ 13–14; Trial Tr. (DE 326-4) at 75–76). They requested T.C.'s mailing address, phone number, and pictures of her children to send to defendant. (See Covington Aff. (DE 326-1) ¶ 13). Although T.C. threatened to call the police and attempted to block the individuals or change her social media accounts, they continued contacting her. (Id. ¶¶ 13–14).

These contacts also must be placed in context of the offense conduct. In addition to defendant's egregious pattern of abuse, control, and prostitution of T.C., he told her that he "had people everywhere" who were his partners in illegal prostitution, and that these individuals would harm T.C. or her family at defendant's direction. The court further finds as fact that defendant knew these contacts would traumatize and harass T.C., and that his contrary testimony that he wanted to contact her to see his child or discuss issues related to his pending motion to vacate was not credible. Accordingly, these contacts also constitute harassing conduct, and they are reasonably likely to influence the willingness of T.C. to testify or participate in this case or related federal cases or investigations. See 18 U.S.C. § 1514(d)(1)(F); Shrader, 675 F.3d at 311–12.

Turning to the course of conduct requirement, the government has established both a "series of acts" and continuity of purpose. 18 U.S.C. § 1514(d)(1)(A). Although defendant only

17

contacted T.H. on two occasions, and he has not attempted to do so again since he sent the letters in December 2022, the statute provides the acts may be committed "over a period of time, however short." Id. Accordingly, there is no requirement that defendant continue the harassment for a specific period of time or while the protective order proceedings are pending. Defendant therefore engaged in a series of acts by sending two letters to T.H. and directing third parties to contact T.C. on at least six separate occasions. (See Covington Aff. (DE 326-1) ¶¶ 6, 8, 13).

The "continuity of purpose" element also is satisfied. Defendant intended to harass both victims by his letters to T.H. and his directives to others to contact T.C., and that purpose continued throughout the contacts. See Shrader, 675 F.3d at 311 (interpreting similar statutory provision to require showing that the "totality of the defendant's conduct evidenced a continuity of purpose").

Defendant's continuity of purpose is further confirmed by the requests for civil discovery directed to T.H. and T.C., filed in connection with his motion to vacate on January 5, 2023. (See DE 294).[11] Therein, defendant requests highly sensitive information from T.H. and T.C., including mental health records and additional information about any mental health diagnoses or treatments. (See DE 294 at 4; DE 294-5 at 3; DE 294-6 at 3). Defendant further requests that T.C. provide another account of the December 9, 2016, assault. (DE 294-5 at 4; see T.C. Trial Tr. (DE 326-4) at 71–78). Finally, defendant asks T.H. to admit that her "child's father was arrested for white slavery in Tennessee." (DE 294-6 at 6). Defendant's argument that this information is necessary to prosecute his pending § 2255 claims is not credible. Instead, these discovery requests constitute another attempt to harass T.H. and T.C. under the pretense of civil discovery, thus demonstrating his continuity of purpose. See United States v. Tison, 780 F.2d

---

[11] The discovery requests are dated December 27, 2022, and they were received and filed on the docket on January 5, 2023. (DE 294-6 at 7).

1569, 1573 (11th Cir. 1986) (concluding the use of civil discovery to harass a victim "is exactly the kind of harassment [18 U.S.C. § 1514] was designed to eliminate"); Lewis, 411 F.3d at 845–46 (holding that filing lawsuit against witness in federal criminal proceeding may constitute harassment).

The government also has established substantial emotional distress. As recounted above, T.H. informed Covington that the letters caused her to feel anxious and angry for days. (Covington Aff. (DE 326-1) ¶¶ 4–8). Notably, defendant previously visited T.H. at the same address where he sent the letters, and he knows that her children, whom he threatened to harm during the offense conduct, live there. Thus, T.H. described receiving the letters as "mind rape and manipulative" and she described defendant's actions as "torment[ing] and harass[ing]" where they reminded her of the trauma she experienced at his hands. (See id. ¶¶ 9–10). Defendant's letters therefore caused substantial mental distress, anguish, and anxiety. See Osinger, 753 F.3d at 945 (defining substantial emotional distress).

With respect to T.H., defendant argued that she could have refused to open the letters and thereby avoided any significant distress. Defendant also suggested that the fact that she opened the second letter indicates she was not suffering substantial emotional distress from the first letter. The court disagrees with these arguments. Given defendant's history of threatening to harm T.H. and her family and his prior physical abuse, T.H. needed to open the letters to confirm that there was no imminent threat to her or her children. In any event, the inquiry is whether defendant's letters caused T.H. substantial emotional distress, and not whether T.H. could have taken additional measures to avoid contact from defendant. See 18 U.S.C. § 1514(b)(1), (d)(B).

Similarly, T.C. reported that the third-party contacts caused her to fear for her own and her children's safety, particularly in light of defendant's prior threats and his statements that he could

19

direct third parties to harm her. (Covington Aff. (DE 326-1) ¶¶ 15–17). These contacts "triggered" T.C.'s significant mental health symptoms, which she previously reported during her allocution at sentencing. (Id. ¶ 17; Sent'g Tr. (DE 210) at 37–38). T.C.'s reaction also constitutes substantial emotional distress. See Osinger, 753 F.3d at 945.

The final component of the definition of harassment is that the communication "serves no legitimate purpose." 18 U.S.C. § 1514(d)(1)(B)(ii). Here, defendant argues that he needed to contact both victims to investigate his allegations of prosecutorial misconduct and violations of the witness sequestration order, as raised in his pending motions to vacate. He also argues that he is the father of one of T.C.'s children and he needs to contact her in order to communicate about the child.

As noted above, defendant has filed motion to vacate his conviction and sentence pursuant to 28 U.S.C. § 2255. (DE 285, 286). Therein, defendant alleges the government committed prosecutorial misconduct in part by "coaching" the witnesses to testify to the government's preferred version of the offense conduct. (See DE 285 at 29–30; DE 286 at 29–30; DE 312; see also Def's Mot. Criminal Contempt (DE 332) at 2). Defendant also claims the government improperly allowed the witnesses to coordinate their testimony in violation of the court's witness sequestration order. (See DE 285 at 29–30; DE 286 at 29–30; DE 312; see also Def's Mot. Criminal Contempt (DE 332) at 2). Defendant asserts the letters he wrote to T.H. and any attempt to contact T.C. were for the legitimate purpose of investigating these claims. At hearing, defendant also suggested that he wanted to contact T.C. to investigate claims related to another victim known as J.C. According to defendant, J.C. provided a statement contradicting T.C.'s testimony that defendant subjected J.C. to forcible sexual encounters with other men. Finally,

20

defendant argues that he could not rely on an attorney to interview the victims where the court denied his motions to appoint counsel and he was not able to secure counsel on his own.

Defendant's assertion that he needed to contact T.H. and T.C. to investigate the foregoing claims is not credible. First, although defendant filed several motions seeking either appointment of counsel or to stay the § 2255 proceedings pending his attempts to secure counsel, he never informed the court that counsel was necessary to contact the victims on his behalf. (See DE 245, 259, 299, 300, 301, 303). The absence of such a request suggests that this proffered reason for contacting the victims was contrived for purposes of resisting the instant motion.

Second, defendant testified that he learned about the alleged prosecutorial misconduct and violations of the sequestration order during the phone call with R.W. in March 2023. But he attempted to contact T.C. in 2021 and T.H. in late 2022, before he even learned about these issues in the conversation with R.W. (See Covington Aff. (DE 326-1) ¶¶ 6, 8, 13). If defendant discovered these claims in March 2023, then investigating them could not have been the legitimate purpose for contacting T.C. in 2021 or T.H. in 2022.

It is true that defendant presented claims regarding violations of the sequestration order in some of his earlier § 2255 motions filed in 2022, before his contact with R.W. discussed at hearing. (See, e.g., DE 256 at 14–15; DE 285 at 29–30). These claims, however, were based on a victim's report during trial that she had lunch with other victims, and not any allegation of prosecutorial coaching or coordination of testimony among the victims. (See id.). Moreover, defendant never suggested in those motions or any of his other voluminous filings prior to December 2022 that he needed to contact T.H. or T.C. regarding these claims. If defendant's reasons for attempting to contact T.H. and T.C. in fact were related to the claims in the § 2255 filings, one would expect some reference to his attempted contacts in these extensive filings. But the court exhaustively

21

reviewed all the pre-December 2022 filings and found no such references or request for assistance contacting the victims.

Third, in the letters to T.H. and a separate letter to government counsel seeking information about T.C., defendant did not request information about prosecutorial misconduct, the alleged violations of the sequestration order, or J.C.'s alleged recantation. (See DE 327-1, 327-2). T.C. also did not report that the social media contacts requested such information. Defendant argues that he did not mention these issues in his letters to T.H. because he wanted to open a line of communication with her first before asking her about the § 2255 claims. While that explanation makes sense as a matter of logic, it loses credibility when considered against the fact that defendant never requested assistance contacting these victims from the court or government counsel. Moreover, as discussed above, the letters to T.H. contain highly disturbing statements, including reminders about the extreme physical and emotional abuse he inflicted on her and that he will "always" love her as a mother "loves it's child." (See DE 327-1). If defendant wanted to open a line of communication with T.C. about issues during the trial, he would not have sent letters making such disturbing comments in his first attempts to communicate with her.

Thus, defendant's testimony that he needed to contact T.H. and T.C. to investigate claims in his pending motion to vacate was not credible. Moreover, defendant's demeanor on the witness stand and portions of his testimony significantly undermined his credibility. For example, defendant stated that he found it "funny" to send disturbing letters to government counsel. Defendant's false testimony establishes that his purpose in attempting to communicate with T.C. and T.H was to harass them, and not to investigate claims in his § 2255 motion. See Wright, 505 U.S. at 296 (trier of fact may consider perjured testimony as affirmative evidence of the opposite fact).

Finally, defendant argues that he attempted to contact T.C. in order to establish a relationship with his child.[12]  This proffered reason finds limited support in the record where T.C. reported that some of the third parties referred to defendant as T.C.'s child's father, and that they requested pictures of her children.  (Covington Aff. (DE 326-1) ¶ 13).  But other evidence cuts firmly against any finding of legitimate purpose based on defendant's asserted need to contact his child.  In the seven years since T.C. became pregnant, defendant has not attempted to establish legal rights to see the child or to be involved in the child's upbringing.  Indeed, defendant was in the community for a lengthy period after T.C. became pregnant, but he offers no evidence that he contacted T.C. regarding the child during this time period.  And despite numerous filings in this court, he has never requested assistance with or permission to contact T.C. for this purpose.  Most troubling, defendant violently assaulted T.C. despite knowing that she was pregnant with his child.  (Trial Tr. (DE 326-4) at 71–79).  In these circumstances, this proffered reason for attempting to contact T.C. is not credible.  Instead, the court finds that any references to T.C.'s child in the subject communications were made to harass T.C.[13]  See Wright, 505 U.S. at 296.  Thus, the government has established that defendant did not have legitimate purpose for contacting T.H. or T.C.

In sum, the evidence establishes defendant's harassing conduct served no legitimate purpose, caused T.H. and T.C. substantial emotional distress, and occurred over a period of time demonstrating continuity of purpose.  See 18 U.S.C. § 1514(b)(1), (d).  Accordingly, after full

---

[12]     Although paternity has not been established through biological testing, T.C. testified at trial that defendant is the father.  (Trial Tr. (DE 326-4) at 77).

[13]     Notwithstanding the foregoing, the court has carved out exception for defendant to have contact with his biological child, if a court authorizes such contact, in the injunction set forth below.

consideration of the record in this case, the parties' filings related to the motion for protective order, and the evidence received at hearing, the court finds the government has proven by a preponderance of the evidence that defendant harassed T.C. and T.H., as that term is defined in 18 U.S.C. § 1514(d). The government therefore is entitled to injunction prohibiting further harassment.

## CONCLUSION

Based on the foregoing, the government's motion for protective order (DE 326) is GRANTED. The court ORDERS the following injunctive relief:

1) Defendant is prohibited from having any direct or indirect contact, including by phone, letter, social media account, or any other means of communication, with the victims in this case referred to as T.H. and T.C., for a three-year period effective from the date of this order. If the defendant knowingly and intentionally violates or attempts to violate this order, he shall be fined as provided in 18 U.S.C. § 1514(c), imprisoned not more than five years, or both; and

2) Defendant is prohibited from having any direct or indirect contact, including by phone, letter, social media account, or any other means of communication, with the immediate family members of T.H. or T.C. for a three-year period, effective from the date of this order, except that defendant may have contact with his biological child if a court order authorizes that contact. If the defendant knowingly and intentionally violates or attempts to violate this order, he shall be fined as provided in 18 U.S.C. § 1514(c), imprisoned not more than five years, or both.

24

SO ORDERED, this the 12th day of August, 2024.

LOUISE W. FLANAGAN
United States District Judge

25